UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIE TOTH, et al.,

        Plaintiffs,

                                    Case No. 12-CV-11700

v.

                                    HON. MARK A. GOLDSMITH

EDWARD CALLAGHAN, et al.,

        Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 29) and GRANTING PLAINTIFFS' AND INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT (Dkts. 32, 34)

### I. INTRODUCTION

This is a civil rights case brought under 42 U.S.C. § 1983 with pendent state law claims for violations of the Michigan Constitution. The initiating Plaintiffs are Christie Toth and the Graduate Employees Organization ("GEO"), a labor organization; the Intervenor Plaintiff is the Board of Regents of the University of Michigan. The initiating Plaintiffs and the Intervenor Plaintiff are collectively referred to herein as "Plaintiffs," unless otherwise specified.[1] Plaintiffs challenge the Michigan Legislature's enactment of Public Act 45 of 2012 ("PA 45"), which effectively barred the Michigan Employment Relations Commission ("MERC") from proceeding with an administrative hearing that was to determine whether certain graduate student employees should be recognized as public employees with rights of collective bargaining at the University of Michigan. Plaintiffs allege that PA 45 violates the equal protection guarantees of the federal and

---

[1] When the initiating Plaintiffs filed their complaint, Alix Gould-Werth was another named plaintiff. However, upon stipulation of the parties, Gould-Werth's claim was withdrawn. 7/31/13 Order (Dkt. 45).

Michigan Constitutions and that the manner by which the Michigan Legislature passed PA 45 violated Article IV, § 24 of the Michigan Constitution (the so-called "title-object" provision, which includes the "change-of-purpose" clause at issue here). All parties filed motions for summary judgment (Dkts. 29, 32, and 34). The motions have been fully briefed and oral argument was held on June 27, 2013. For the reasons set forth below, the Court grants summary judgment on the title-object claim in favor of Plaintiffs, denies Defendants' motion for summary judgment, and declines to rule on the equal protection claims.

## II. BACKGROUND

### A.   Proceedings Before MERC

In 1981, MERC determined an unfair labor charge brought by GEO on behalf of three groups of graduate student assistants at the University of Michigan: graduate student research assistants ("GSRAs"), teaching assistants, and staff assistants. 1981 MERC Lab. Op. 777 (Dkt. 34-1). GEO argued that all three categories of graduate student assistants were "public employees" under the Public Employment Relations Act ("PERA"), Mich. Comp. Laws § 423.1, et seq., and were thus entitled to collective bargaining rights. Id. at 780. The University of Michigan opposed GEO's position. Id. MERC held that teaching assistants and staff assistants were public employees under PERA, but found that GSRAs were not public employees. Id. at 782.

In 2011, the University of Michigan, through its Board of Regents, adopted a resolution recognizing GSRAs as public employees and supporting their effort to organize. 5/19/11 Resolution (Dkt. 29-3).[2] In doing so, the resolution provided GSRAs with the same status as

---

[2] The text of the resolution reads:

Graduate Student Instructors ("GSIs," formerly known as "teaching assistants") and Graduate Student Staff Assistants ("GSSAs," formerly known as "staff assistants"). GEO also petitioned MERC to reverse its 1981 ruling that GSRAs were not public employees under PERA. MERC denied GEO's petition. MERC Op. No. R11 D-034, 2011 WL 4642545 (Sept. 14, 2011).

GEO then moved for MERC to reconsider its decision. The Michigan Attorney General and a student group opposed to graduate student unionization filed motions to intervene. MERC Op. No. R11-D034, 2011 WL 7063731 (Dec. 16, 2011). MERC denied the motions to intervene, granted GEO's request for reconsideration, and ordered an administrative law judge ("ALJ") to conduct hearings to determine whether circumstances had changed regarding the status of GSRAs, such that MERC should reverse its 1981 decision. Id.

Prior to the ALJ conducting the administrative hearing, the Michigan Attorney General appealed MERC's order to the Michigan Court of Appeals. The Court of Appeals dismissed the appeal for lack of jurisdiction. The Michigan Attorney General then appealed to the Michigan Supreme Court, which affirmed the Michigan Court of Appeals' decision. Univ. of Michigan v. Graduate Emps. Org./AFT, 807 N.W.2d 714 (Mich. 2012). However, after granting reconsideration, MERC suspended its review of GEO's petition because, as explained below, the Michigan Legislature amended PERA to expressly exclude GSRAs from collective bargaining by passing PA 45. See Interv.'s Br. at 8 (Dkt. 32); Defs.' Resp. Br. at 5 (Dkt. 39).

---

Resolved, that consistent with the University of Michigan's proud history of strong, positive, and mutually productive labor relations, the Board of Regents supports the rights of graduate Student Research Assistants, whom we recognize as employees, to determine for themselves whether they choose to organize.

5/19/11 Resolution (Dkt. 29-3) (capitalization in original).

3

**B.   House Bill 4246**

In February 2011, the Michigan House of Representative passed House Bill (HB) 4246, which required public collective bargaining agreements to include a provision that allowed emergency managers to reject, modify, or terminate those agreements.   2/23/11 House Journal at 215-216 (Dkt. 34-8).   As originally drafted, HB 4246 had the following relevant section:

> EACH COLLECTIVE BARGAINING AGREEMENT ENTERED INTO BETWEEN A PUBLIC EMPLOYER AND PUBLIC EMPLOYEES UNDER THIS ACT AFTER THE EFFECTIVE DATE OF THE AMENDATORY ACT THAT ADDED THIS SUBSECTION SHALL INCLUDE A PROVISION THAT ALLOWS AN EMERGENCY MANAGER APPOINTED UNDER THE LOCAL GOVERNMENT AND SCHOOL DISTRICT FISCAL ACCOUNTABILITY ACT TO REJECT, MODIFY, OR TERMINATE THE COLLECTIVE BARGAINING AGREEMENT AS PROVIDED IN THE LOCAL GOVERNMENT AND SCHOOL DISTRICT FISCAL ACCOUNTABILITY ACT.

HB 4246 at 5 (Dkt. 35-11).   After passage, the House sent HB 4246 to the Senate.

This version of HB 4246 was not considered by the Michigan Senate.   Instead, Senate Bill (SB) 158, which included nearly identical language, was passed by the Michigan Senate and the Michigan House of Representatives, and signed into law by Governor Rick Snyder on March 16, 2011 as Public Act 9.   Enrolled Senate Bill 158 (Dkt. 34-9).

Almost a year later, on March 7, 2012, the Senate took up HB 4246, and substituted the language in it with the language from another bill, SB 971, which excluded GSRAs from the definition of "public employee."   3/7/12 Senate Journal at 327 (Dkt. 34-16); HB 4246 history at 2 (Dkt. 34-17).   The substitute text of HB 4246 stated, in pertinent part:

> AN INDIVIDUAL SERVING AS A GRADUATE STUDENT RESEARCH ASSISTANT OR IN AN EQUIVALENT POSITION AND ANY INDIVIDUAL WHOSE POSITION DOES NOT HAVE SUFFICIENT INDICIA OF AN EMPLOYER-EMPLOYEE RELATIONSHIP USING THE 20-FACTOR TEST ANNOUNCED BY THE INTERNAL REVENUE SERVICE OF THE UNITED STATES

4

DEPARTMENT OF TREASURY IN REVENUE RULING 87-41, 1987-1 C.B. 296 IS NOT A PUBLIC EMPLOYEE ENTITLED TO REPRESENTATION OR COLLECTIVE BARGAINING RIGHTS UNDER THIS ACT.

HB 4246, as passed by the Senate on 3/7/12, at 3 (Dkt. 35-13).[3]

During the passage of HB 4246, Senator Gretchen Whitmer raised a point of order that HB 4246, as amended, represented an unconstitutional change of purpose.   3/7/12 Senate Journal at 327 (Dkt. 34-16).   The President pro tempore of the Michigan Senate, Senator Tonya

---

[3] Defendants and Plaintiffs state that the 2012 version of HB 4246 represents the second attempt by the Legislature to amend PERA regarding GSRAs.   See Interv.'s Br. at 6 (Dkt. 32); Defs.' Resp. Br. at 4 (Dkt. 39).   In February 2012, the Michigan Senate passed SB 971.   2/22/12 Senate Journal at 235-236 (Dkt. 34-13).   The bill was sent to the House where it passed without change on March 1, 2012.   3/1/12 House Journal 302-303 (Dkt. 34-14).   Although SB 971 was passed by both chambers of the Michigan Legislature, it was not sent to the Governor for his signature. Interv.'s. Br. at 5-7 (Dkt. 32).   According to Plaintiffs, the reason for SB 971's dormancy and then resurrection into HB 4246 had to do with the need to establish "immediate effect" for the GSRA legislation.   Id. at 6.   Under the Michigan Constitution, if an act is not given immediate effect it will not take effect until 90 days after conclusion of the legislative session.   However, by a two-thirds vote of each house of the Legislature, an act's effect can be immediate upon being signed into law.   Mich. Const. art. IV, § 27.

Plaintiffs theorize that the reason SB 971 was not sent to the Governor after passage was the lack of votes in the House for immediate effect.   Interv.'s Br. at 6.   According to Plaintiffs, after the House passed the bill on a vote of 62-45, a motion for a roll call vote on a motion for immediate effect was recognized by the Chair.   That vote was postponed indefinitely, however, because proponents believed that they could not muster the 74 votes necessary to give the measure immediate effect.   Id.   Plaintiffs claim that proponents of the legislation feared that, without immediate effect, SB 971 would not have been effective until sometime in 2013, by which point MERC could have allowed GSRA unionization.   For this reason, proponents purportedly resorted to revising HB 4246, which had already been given immediate effect by the House in February 2011 — when it contained the language empowering emergency managers to limit or terminate collective bargaining agreements.   The Senate then passed amended HB 4246, gave it immediate effect, and transmitted it to the House.   The measure was then adopted by the House and no new vote on immediate effect was taken, on the theory that the 2011 "immediate effect" vote on the initial version of HB 4246 applied to the amended version.   See id. at 8.

Defendants neither admit nor deny Plaintiffs' theory on the machinations of the Legislature, Defs.' Resp. Br. at 4 (Dkt. 38); Defs.' Resp. Br. at 4 (Dkt. 39), but they offer no alternative theory to explain the unusual legislative activity.   While Plaintiffs' theory is not relevant to the change-of-purpose analysis, it may serve to explain why events transpired as they did.

5

Schuitmaker, ruled that HB 4246 was constitutional because the bill was a "multisection bill, it is not a change of purpose, and the bill as introduced is still in this bill." Id. The President of the Senate, Lieutenant Governor Brian Calley, clarified Senator Schuitmaker's ruling and made his own ruling, stating that HB 4246 did not violate the Michigan Constitution because HB 4246 was "a multisection PERA bill" and that the original version of the bill and the revised version of the bill both made changes to Sections 1 and 15. Id. at 328.[4] According to Lieutenant Governor Calley, both sections addressed "the same original purpose of regulating collective bargaining." Id.

After the passage of HB 4246, the Senate held a roll call vote to give the bill immediate effect. Id. at 330. Thereafter, the Senate Journal reflects protests made by various Michigan Senators. In particular, Senator Whitmer highlighted her belief that "there was nothing . . . before the Senate that was in House Bill No. 4246 when it was introduced." Id. at 331. Senator Whitmer further emphasized that the Senate can "not just ram things through by entirely replacing bills with new content." Id. Senator Whitmer stated that the version of HB 4246 violated the Michigan Constitution, but the Senate nevertheless passed the legislation. Id.

After passage of amended HB 4246 by the Michigan Senate, the bill returned to the House. HB 4246 history at 2 (Dkt. 34-17). The House then passed amended HB 4246. Id. The bill was signed into law by the Governor on March 13, 2012 as PA 45. Id.

---

[4] In fact, Lt. Governor Calley was mistaken; the original version made a change only to Section 15 of PERA (by adding a provision about emergency managers); there was no change to Section 1. Compare Defs.' Ex. 9 (Dkt. 29-10) (4246 as introduced) with Defs.' Ex. 10 (Dkt. 29-11) (4246 as enacted).

### C.   Procedural Background of the Instant Case

Plaintiffs filed suit a month after PA 45 became law, naming the commissioners of MERC in their official capacities as Defendants.   Compl. (Dkt. 1).   Initiating Plaintiffs' complaint contains two counts: an alleged violation of the equal protection clause of the Fourteenth Amendment to the U.S. Constitution (Count I) and an alleged violation of the title-object clause of the Michigan Constitution (Count II).

Intervenor filed its intervening complaint (Dkt. 12) soon afterward, upon stipulation of the parties (Dkt. 10), against the same Defendants.   The intervening complaint originally alleged four counts: (i) violation of the equal protection clause of the Fourteenth Amendment of the U.S. Constitution; (ii) violation of the equal protection clause of Michigan's Constitution; (iii) violation of the change-of-purpose clause of the title-object provision of Michigan's Constitution; and (iv) violation of the "immediate effect" clause of Michigan's Constitution.   After the filing of the intervening complaint, the parties stipulated to the dismissal of the "immediate effect" claim of the intervening complaint.   1/28/13 Order (Dkt. 22).

### III. SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   To withstand summary judgment, the nonmoving party must present sufficient evidence to create a genuine issue of material fact.   Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004).   A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for the nonmovant."   Id.   "After adequate time for discovery and upon motion, summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon

7

which that party bears the burden of proof at trial."  Kalich v. AT & T Mobility, LLC, 679 F.3d 464, 469 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

## IV. ANALYSIS

Before the Court are state and federal constitutional issues.  In such a situation, the traditional judicial response is to resolve the state constitutional issues first, if, by doing so, the court can avoid resolving federal constitutional issues.  For the reasons that follow, the Court concludes that the state constitutional claims asserting a violation of Michigan's change-of-purpose clause are dispositive of the action and, under principles of constitutional avoidance, the Court refrains from ruling on the equal protection claims as they implicate the U.S. Constitution.

### A.  Constitutional Avoidance

Under the doctrine of constitutional avoidance, federal courts should avoid federal constitutional determinations when a case can be resolved on other grounds.  Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 193 (1909) ("Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons."); Tower Realty v. City of East Detroit, 196 F.2d 710, 724 (6th Cir. 1952) ("It is the duty of federal courts to avoid the unnecessary decision of the constitutional questions."); United States v. Elkins, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts should avoid unnecessary constitutional questions."); see Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

The doctrine of constitutional avoidance encourages courts to avoid making a pronouncement concerning the federal constitution when a state law ground is available to decide

8

a case.  See, e.g., Hagans v. Lavine, 415 U.S. 528, 546-547 & n.12 (1974) ("The Court has characteristically dealt first with possibly dispositive state law claims pendent to federal constitutional claims."); Bell v. Maryland, 378 U.S. 226, 237 (1964) (referring to the Court's "policy of refusing to decide a federal question in a case that might be controlled by a state ground of decision"); Gannett Outdoor Co. of Mich. v. City of Pontiac, 948 F.2d 1288 (Table) (6th Cir. 1991) (holding that the district court should have addressed state law issues concerning zoning ordinances before reaching federal constitutional issues); WJW-TV, Inc. v. City of Cleveland, 870 F.2d 658 (Table), at *5 n.4 (6th Cir. 1989) ("However, this court does note that by declining to consider WJW's state law claims before reaching the First Amendment claim, the district court erred in ignoring the Supreme Court's admonition that federal constitutional issues should not be decided where a dispute can be resolved on the basis of pendent state law claims.").

Even where the state law claim is a constitutional one, that claim should be decided first to avoid the federal constitutional claim if possible.  See, e.g., Allstate Ins. Co. v. Serio, 261 F.3d 143, 150 (2d Cir. 2001) (explaining that courts use the doctrine of constitutional avoidance to "render decisions on federal constitutional questions unnecessary by resolving cases on the basis of state law (whether statutory or constitutional)" (citing Bell, 378 U.S. at 237)); Hickerson v. City of New York, 932 F. Supp. 550, 555 (S.D.N.Y. 1996) ("Plaintiffs raise substantial claims under the state constitution.  These state constitutional claims should be determined before plaintiffs' claims under the federal constitution, because a ruling that the resolution violates the state constitution would obviate the need to decide the federal constitutional questions.").[5]

---

[5] There is no operative Sixth Circuit decision so holding. The panel decision in City of Pontiac Retired Employees Association v. Schimmel, 726 F.3d 767 (6th Cir. 2013), did so hold.  Id. at 771 ("When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution.").  But that decision was vacated

The Court recognizes that "[i]f the germane state law questions are novel or unsettled, . . . principles of federalism counsel in favor of allowing state courts, instead of federal courts, to interpret and define state law before the federal courts subject the state law to federal constitutional scrutiny." Pittman v. Cole, 267 F.3d 1269, 1285 (11th Cir. 2001) (citing Serio, 261 F.3d at 149). This may be accomplished through either abstention or certification procedures, id., which no party has invoked. However, the change-of-purpose challenge is not a novel question of Michigan law. The Michigan state courts have addressed change-of-purpose challenges numerous times. See, e.g., People v. Kevorkian, 527 N.W.2d 714, 723 (Mich. 1994); Anderson v. Oakland Cnty. Clerk, 353 N.W.2d 448 (Mich. 1984).

Following the dictates of the constitutional avoidance doctrine, the Court considers initially Plaintiffs' claim that the Michigan Legislature violated the change-of-purpose clause of the Michigan Constitution. Because the Court finds that issue dispositive of the case, the Court refrains from ruling on the equal protection claims.[6]

---

by a grant of rehearing en banc (Nov. 8, 2013).

[6] While initiating Plaintiffs assert only an equal protection claim under the U.S. Constitution, Intervenor asserts equal protection claims under both the U.S. Constitution and the Michigan Constitution. Interv.'s Compl. ¶¶ 41-54 (Dkt. 12). However, the provisions of the federal and Michigan equal protection clauses have similar language and are coextensive. Doe v. Dep't of Soc. Servs., 487 N.W.2d 166, 174 (Mich. 1992) (concluding that the equal protection clause of the Michigan Constitution "was intended to duplicate the federal clause and to offer similar protection"). Courts have routinely treated a federal equal protection claim and a Michigan equal protection claim the same. Bass v. Robinson, 167 F.3d 1041, 1050 n.4 (6th Cir. 1999). Deciding the equal protection issue in our case under state law would be equivalent to deciding it under federal law. Therefore, in deciding which state law claim to address first, the Court addresses first the narrower issue raised by the change-of-purpose challenge, so as to avoid a broader constitutional decision implicating the federal constitution. See Nichols v. United States, 563 F.3d 240, 242 (6th Cir. 2009) (deciding case on narrower constitutional grounds and explicitly avoiding broader constitutional question).

### B.  The Change-of-Purpose Claims

With regard to the change-of-purpose claims, Plaintiffs allege that the passage of PA 45 violated Article IV, § 24 of the Michigan Constitution, which provides:

> No law shall embrace more than one object, which shall be expressed in its title.  No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.

Mich. Const. art. IV, § 24.

The Michigan Supreme Court has held that there are three kinds of challenges that may be brought pursuant to Article IV, § 24: (i) a "title-body" challenge, (ii) a "multiple-object" challenge, and (iii) a "change of purpose" challenge.  <u>Kevorkian</u>, 527 N.W.2d at 720.  In a title-body challenge, a plaintiff alleges that "the title of the act does not adequately express the content of the law."  <u>Id.</u>  In a multiple-object challenge, the plaintiff alleges that an act "contains subjects so diverse that they have no necessary connection."  <u>Twp. of Ray v. B & BS Gun Club</u>, 575 N.W.2d 63, 67 (Mich. Ct. App. 1997).  Neither of those challenges is at issue here.

The challenge relevant to this case is the change-of-purpose challenge, where a court must examine whether "the subject matter of the amendment or substitute is germane to the original purpose" of a bill.  <u>Kevorkian</u>, 527 N.W.2d at 723.  If "changes fall within the general purpose of the original bill, or are extensions of it," courts have held the changes to be germane.  <u>Anderson</u>, 353 N.W.2d at 454.  If the changes are not within the general purpose of the original bill, the enacted legislation is void because it evaded the procedural protections mandated by the Michigan Constitution.  <u>Id.</u>

Plaintiffs argue that PA 45's purpose was materially changed during its passage.  <u>See</u> Pls.' Br. at 13 (Dkt. 34); Interv.'s Resp. at 17-22 (Dkt. 40).  Their theory is that the purpose of HB

11

4246, as originally introduced in 2011, was to empower emergency financial managers to terminate or modify collective bargaining agreements with local governments and school districts, while the adopted version of the bill in 2012 had an "utterly disparate and unrelated" purpose of barring certain university graduate student employees from enjoying collective bargaining rights. Pls.' Br. at 13 (Dkt. 34).   Defendants' position, as articulated in their motion for summary judgment and response briefs, is that there was no change in purpose because both versions of the bill address the subject matter of regulating collective bargaining.   See Defs.' Br. at 16-20 (Dkt. 29).   After reviewing the history of this constitutional provision and the pertinent cases, the Court agrees with Plaintiffs.

The constitutional protections reflected in the title-object provision found in the 1963 Constitution, including the change-of-purpose clause, go back to Michigan's 1908 Constitution:

> No bill shall be passed or become a law at any regular session of the legislature until it has been printed and in the possession of each house for at least five days. … No bill shall be altered or amended on its passage through either house so as to change its original purpose.

1908 Mich. Const. art. V, § 22.

The record from the 1907-08 constitutional convention indicates that this section prohibiting a bill's change of purpose was included so "that by no possibility can the publicity secured by the five day rule [prohibiting a bill from being passed until "it has been printed and in the possession of each house" for this period of time] be nullified or evaded."   State of Michigan, Journal of Constitutional Convention of 1907-08, at 1551.   The record also explains that this "new section" was "inserted to prevent hasty and careless legislative action, also, to deal effectively with so called snap legislation."   Id.   The drafters of the 1908 Michigan Constitution believed that this provision would provide sufficient time "whereby the people may become

12

acquainted with proposed legislation and to petition, or remonstrate, before a bill is passed.   It is believed that this provision will measurably improve the tone of legislative action."   Id.

In 1961, when Michigan re-wrote its Constitution, the change-of-purpose clause was retained and strengthened, to effectuate the goal of giving fair notice to the public of the legislation under contemplation.   A phrase was added — "as determined by its total content and not alone by its title" — so that the change-of-purpose protection would not be eviscerated by reference to an overly broad title:

> The committee is of the opinion that this section should be retained and strengthened somewhat.  The first sentence of the section [the five-day provision] is a preventive against hasty and careless legislation.  It allows publicity to be given to pending legislative action so the electorate becomes informed. This provision does not prevent unprinted amendments, but the last sentence of the section prevents any change in original purpose.
> * * *
> The last sentence [the change-in-purpose clause] was first found in the 1908 constitution.  The provision that no amendment is allowed which would change a bill's original purpose is to preclude the possibility that the publicity insured by the 5 day provision will not be nullified or evaded.
>
> The new language strengthens the provision.  By reference to the title alone, a title too broad would circumvent the provision confining bills to their original purpose.
>
> The committee is of the opinion that the "original purpose" provision along with the requirement that bills must be printed for 5 days prior to passage is a limitation which should be retained.  Action taken in haste is likely to prove itself not in the best interests of the people.

State of Michigan, Constitutional Convention of 1961, Official Record, Vol. II, at 2334-2335.

This strengthening of the change-of-purpose clause was designed to make the clause even more "air tight" in protecting against precipitous legislation, as the record of the 1961 Convention confirms:

> Mr. Kuhn: * * * Toward the end [of the proposal], we use this language starting on line 14, "No bill shall be altered or amended on its passage

13

> through either house so as to change its original purpose as determined by
> its total content and not alone by its title."   Once again, if you will read the
> Address to the People of the 1908 convention, they wanted this air tight so
> the people were aware of what was to be before the legislature when a bill
> was up so they have some idea.   This is only going a step further to make it
> tight so the people will have some idea of what is in a particular bill and so
> they can't change the purpose.

Id. at 2335.   As a commentary on the Michigan Constitution confirms, the "Constitution of 1963
added language requiring scrutiny of the content of the bill as well as its title to determine original
purpose.   The framers of the 1963 Constitution wanted to make sure that the public could be sure
of what was before the legislature."   Susan P. Fino, The Michigan State Constitution: A
Reference Guide 85 (1996).

       This history confirms that the change-of-purpose clause can be meaningful only if the
analysis of a bill's "purpose" focuses on fair notice to the public.   If identifying merely some
commonality of subject matter between a bill as introduced and as enacted is sufficient to pass
constitutional muster, then the change-of-purpose clause will provide no effective protection to the
public at all.   Instead, courts must ask whether those members of the public who are interested in,
or affected by, an enactment were put on fair notice that the bill, as introduced, might impact their
interests.

       The Michigan courts have been faithful to the constitutional command that the Legislature
give the public fair notice of the reach of legislation it contemplates adopting.   In Anderson, a bill
was passed by the Michigan House of Representatives to amend Michigan's election law by (i)
eliminating a requirement that county clerks deliver absentee ballots to municipal clerks in school
districts holding late millage elections and (ii) enacting some provisions relating to a special
election on income taxes in Detroit.   Anderson, 353 N.W. 2d at 450.   The Michigan Senate then
took up the original bill, deleted the provisions relating to county clerks and Detroit income tax,

14

and substituted language reapportioning the Legislature into 38 senatorial and 110 representative districts.   Id. at 451.   The Michigan Senate and House both passed the substituted version of the bill and the governor signed it into law as Public Act 256 of 1983 (PA 256).   Id. at 451-452. Registered voters affected by the reapportionment filed suit, claiming that the enactment of PA 256 violated Article IV, § 24 of the Michigan Constitution; the trial court agreed.   Id. at 452. After appeal to the Michigan Court of Appeals was by-passed, the Michigan Supreme Court affirmed.   Id.   In holding that the enactment of PA 256 violated Article IV, § 24, the Michigan Supreme Court concluded that the enactment constituted "'the introduction of entirely new and different subject matter.'"   Id. at 456 (quoting U.S. Gypsum Co. v. Dep't of Revenue, 110 N.W.2d 698, 701 (Mich. 1961)).   In enforcing the change-of-purpose clause, the Court explained that "[t]hese are not recent provisions.   A long history underscores an intent through these requirements to preclude last-minute, hasty legislation and to provide notice to the public of legislation under consideration irrespective of legislative merit."   Id. at 455.

The same concern with fair notice is found in Kevorkian, the primary case relied upon by Defendants, which rejected a change-of-purpose challenge.   That case related to the passage of Public Act 270 of 1992 (PA 270), addressing assisted suicide.   The bill at issue originated as HB 4501, which provided for the creation of the Michigan Commission on Death and Dying, conceived as a forum to study assisted suicide.   Kevorkian, 527 N.W.2d at 719.   The bill was subsequently amended by adding a section that would make it a crime to assist another in committing suicide.   This amended version of the bill was passed by both houses of the Legislature and signed into law by the Governor.   A group of individuals in support of assisted suicide filed suit, seeking a declaratory judgment that PA 270 was unconstitutional for violating the change-of-purpose clause of Article IV, § 24, among other grounds.   Id. at 717.

15

The Michigan Supreme Court rejected the plaintiffs' argument that adding the criminal penalties to HB 4501 through the substitute bill "dramatically changed" the original purpose of creating the commission.   Id. at 723.   In doing so, the court recognized that the impetus for the change-of-purpose clause is to "preclude last-minute, hasty legislation and to provide notice to the public of legislation under consideration" and to protect the integrity of the "five-day rule."   Id. (citing Anderson, 353 N.W.2d at 455).   But the court found no undermining of these constitutional concerns because the subject matters of the bill, as enacted and as introduced, were intimately related.   The criminal penalties "were an interim measure" that provided "a stable environment while the Commission on Death and Dying, the Legislature, and the citizenry" studied assisted suicide further.   Id.

Here, the content of the enactment is entirely unrelated to the content of HB 4246 when introduced.   HB 4246, as introduced, addressed the powers of an emergency manager; the final legislation does not address emergency managers at all.   HB 4246, as introduced, regulated the contents of collective bargaining agreements; the final legislation says nothing about the content of collective bargaining agreements.   HB 4246, as introduced, regulated local governments and school districts; the final legislation addresses the organization of graduate students at the university level.   These subject matters have virtually no commonality at all.

A comparison of the language used in the two versions confirms this.   HB 4246, as introduced on February 10, 2011, mandated the inclusion in local government collective bargaining agreements of a section "that allows an emergency manager appointed under the Local Government and School District Fiscal Accountability Act to reject, modify, or terminate the collective bargaining agreement as provided in the Local Government and School District Fiscal

Accountability Act."  HB 4246, as introduced on 2/10/11, at 5 (Dkt. 35-11).  The drastically

different, enacted version contains absolutely no overlap in language:

> an individual serving as a graduate student research assistant or in an
> equivalent position and any such individual whose position does not have
> sufficient indicia of an employer-employee relationship using the 20-factor
> test announced by the Internal Revenue Service of the United States
> Department of Treasury in Revenue Ruling 87-41, 1987-1 C.B. 296 is not a
> public employee entitled to representation or collective bargaining rights
> under this act.

HB 4246, as passed by Senate on 3/7/2012, at 3 (Dkt. 35-13).  These versions clearly address

entirely different circumstances.[7]

Changes in the title of the legislation during its passage in the Legislature also confirm a

marked change in purpose.  As introduced, HB 4246 announced in its title that it was amending

only Section 15 (to require collective bargaining agreements to contain a provision allowing

emergency managers of local governments and school districts to modify or terminate such

agreements) and adding a new Section 15a (recognizing the emergency manager's power to

modify or terminate such agreements).   See HB 4246, as introduced on 2/10/11, at 1 (Dkt. 35-11).

As enacted, the title states that it is amending both Section 1 (excluding GSRAs and others from

the definition of public employee) and Section 15 (inserting certain stylistic changes); it entirely

fails to mention Section 15a.  See HB 4246, as passed by Senate on 3/7/2012, at 1 (Dkt. 35-13).

---

[7] Notably, differing summaries of the bills containing the subject language were prepared by the
Legislative Service Bureau, the state agency charged with the "responsibility to compare pending
bills with existing laws for the purpose of avoiding conflicts."   Apsey v. Memorial Hosp., 730
N.W.2d 695, 703 (Mich. 2007) (Kelly, J., concurring).   The Legislative Service Bureau stated that
original HB 4246 addressed "Labor; collective bargaining; certain provisions in public service
contracts; require. Amends title & sec. 15 of 1947 PA 336 (MCL 423.215) & adds sec. 15a."
Interv.'s Ex. 17 (Dkt. 35-17).   SB 971, which first put forward the language excluding GSRAs
from the definition of "public employee," was characterized as "Labor; public service
employment; definition of public employee; restrict. Amends sec. 1 of 1947 PA 336 (MCL
423.201)."   Interv.'s Ex. 18 (Dkt. 35-18).

Defendants argue that there is some relationship between the two versions of the legislation because both address collective bargaining rights. Defs.' Br. at 19 (Dkt. 29). But this bare overlap of subject matter cannot be sufficient if the change-of-purpose clause is to have any real significance. As stressed above, the constitutional history confirms that the change-of-purpose clause can be meaningful only if the analysis of a bill's "purpose" focuses on fair notice to the public. Therefore, the question that must be asked here is: Were those members of the public who were interested in an enactment barring unionization of GSRAs fairly apprised that an earlier submitted bill on emergency manager powers would touch their interests?

In our case, a member of the public interested in the issue of unionization of GSRAs would have no reason to believe that a bill addressing the powers of emergency managers over local governments and school districts could have any impact on that issue. Emergency managers, by statute, can only be appointed over local units of government. See Mich. Comp. Laws § 141.1549(1) ("The governor may appoint an emergency manager to address a financial emergency within that local government as provided for in this act."), and § 141.1542 (defining "local government" as "a municipal government or a school district"). A member of the public concerned with union activity at the university level would hardly be alerted that their interests would be impacted by legislation targeted at local governments. Moreover, an emergency manager's power to modify or nullify a collective bargaining agreement does not implicate the issue of what group of employees may organize into a union in the first place. The focus of the former issue is rehabilitation of financially troubled units of governments, while the latter issue concerns whether a particular group of employees may organize at all. As a consequence, HB

18

4246 would not have reasonably alerted anyone interested in graduate student teacher unions that the bill would be the evolving vehicle for legislation affecting their interests.[8]

Defendants' other arguments are also unavailing.  Defendants contend the two bills are similar because they both amend PERA.  Defs.' Br. at 19-20.  While it is true that both versions amended PERA, the amendments address entirely unrelated subject matters within the statute.  Again, the public has no fair notice of a contemplated change in the definition of "public employee" when it learns that emergency managers may be granted powers of contract termination and modification vis-à-vis local government bargaining agreements.

Defendants further argue that it is "important" that HB 4246 was passed by both the House and Senate.  Defs.' Br. at 18.  However, a change-of-purpose challenge can only arise if legislation has been passed by both houses of the Legislature.  Therefore, that fact does not appear to have any significance to the change-of-purpose analysis; and in any case, its significance remains unexplained by Defendants.

Defendants also think it is relevant that the issue of unionization of graduate student teachers had been receiving a good deal of publicity prior to passage of HB 4246.  Defs.' Br. at 18.  To substantiate this point, Defendants point only to debates on the floor.  See id. (citing 3/7/12 House Journal at 333-334).  However, a floor debate does not demonstrate general public awareness of an issue, nor would it satisfy the constitutional concern that the public — as distinct from legislators — have notice of impending legislation.  Moreover, Defendants supply no

_____

[8] There is another "notice" issue, which no party has addressed in the change-of-purpose analysis.  Amended HB 4246 not only modified the definition of "public employee" to exclude GSRAs, it also required every public employee to meet the 20-factor IRS test, which distinguishes "employees" from "independent contractors."  This language had not been in HB 4246 when it was introduced.  Members of the public who were interested in the definition of a "public employee" had no notice whatsoever that HB 4246 would address that subject.

19

authority holding that a court should evaluate the actual publicity that an enactment has received prior to passage as part of a change-of-purpose analysis. In fact, there is contrary authority rejecting this argument. See Anderson, 353 N.W.2d at 460 (Levin, J., concurring) (rejecting the state's argument that media publicity should be considered in conducting a change-of-purpose analysis because it would unduly "expose many enactments to judicial inquiry regarding the extent of the publicity and the adequacy of the legislative consideration"). Defendants' "publicity" argument lacks merit.[9]

Case law undermines Defendants' position as well. Anderson is remarkably similar to our case. In Anderson, the Senate took up a bill passed by the House, swapped out the original language pertaining to absentee ballots and a special income tax election for the City of Detroit, replaced it with reapportionment language, and passed the bill. Anderson, 353 N.W. 2d at 451. The House then passed the substituted version, which was signed into law. Id. at 451-452. Similarly, in the instant case, the Senate took up HB 4246, which had laid dormant for over a year, swapped out the language concerning emergency managers for the language excluding GSRAs from collective bargaining, and passed the bill. Importantly, if the Michigan Supreme Court in Anderson had believed that commonality of subject matter at any level of generality was acceptable, it could have easily rebuffed the change-of-purpose challenge, given that both the initial bill and the amended one pertained to elections. Such tangential overlap was clearly not sufficient to sustain the constitutionality of the legislation.

---

[9] Defendants make another argument that is a plain misreading of Kevorkian. They argue that "[i]t is well settled that the language of the bill as originally presented is of little relevance to determining whether an amendment falls within the primary object of the bill. Kevorkian, 527 N.W.2d at 721." Defs.' Br. at 18. However, in that part of the opinion, the court was addressing a multiple-object challenge — not a change-of-purpose challenge. In fact, the opinion criticized the Court of Appeals for failing to recognize that a change-of-purpose challenge should focus on the language of the bill as introduced — the same error, ironically, that Defendants commit here.

Similarly, Defendants' position is undermined by <u>Kevorkian</u>, even though they invoke it. Defs.' Br. at 17-20. The general test announced in <u>Kevorkian</u> requires a court to focus on the "original purpose" of the bill, as introduced. <u>Kevorkian</u>, 527 N.W.2d at 723 (the "test for determining if an amendment or substitute changes a purpose of the bill is whether the subject matter of the amendment or substitute is germane to the original purpose"). Notably, the court did not simply compare the bare subject matter of assisted suicide in the original and amended bills; rather, it considered how the purpose of the original bill — studying the issue of assisted suicide — could be promoted by creating a "stable" environment for study through the adoption of criminal penalties. <u>Id.</u> Thus, <u>Kevorkian</u> upends Defendants' argument that even a minimal overlap of subject matter between the introduced and final version of a bill is sufficient to turn back a change-of-purpose challenge.

The other authority relied upon by Defendants is similarly unpersuasive. <u>Builders Square v. Department of Agriculture</u>, 440 N.W.2d 639 (Mich. Ct. App. 1989), is inapposite because it involved a multiple-object challenge, not a change-of-purpose challenge. In <u>Builders Square</u>, the plaintiff-corporation sought injunctive relief from having to comply with a directive issued by the Michigan Department of Agriculture enforcing the "item pricing and deceptive advertising" provisions of Mich. Comp. Laws § 445.352 The trial court granted an injunction, holding that the act in question had at least two objects. <u>Id.</u> The court of appeals reversed, stating that "[a]lthough dissimilar, the act's two objectives, regulation of pricing and advertising, are not so diverse in nature as to be at odds with the constitution" and that the objects were "consistent with

the overall purpose, consumer protection." Id. at 641. However, the instant case does not involve a multiple-object challenge. As such, Builders Square is simply inapposite.[10]

The legislative reality is that HB 4246, in its original design, had nothing to do with the definition of who was a public employee. Its purpose was to empower emergency managers to void or modify collective bargaining agreements at the local government and school district level. By importing language from another bill, the Legislature reincarnated HB 4246 as the legislative vehicle to prevent a particular group of employees from qualifying as public employees at the university level — a subject that has nothing to do with an emergency manager's powers in the local government and school district context.

Michigan law has long recognized the need for a thorough public airing of potential legislative enactments. The change-of-purpose clause is central to that venerable history, serving as a bulwark against hasty and surreptitious legislative activity. While a legislative enactment is entitled to a presumption of constitutionality, Michigan Educ. Special Servs. Ass'n v. Comm'r of Ins., 425 N.W.2d 157, 159 (Mich. Ct. App. 1988), the people's will, through their constitution, must be respected. People v. Cathey, 190 N.W. 753, 754 (Mich. 1922) ("The will of the people as

---

[10] Defendants also rely on Wayne County Board of Commissioners v. Wayne County Airport Authority, 658 N.W.2d 804 (Mich. Ct. App. 2002), addressing numerous challenges to Act 90 of 2002 (PA 90), Mich. Comp. Laws § 259.108, et seq., which added a chapter, the "public airport authority act," to the Michigan Aeronautics Code. Wayne Cnty., 658 N.W.2d at 814. PA 90 provided for the incorporation of public airport authorities (PAAs) and for the transfer of airport management to the PAAs. Id. Plaintiffs sued, claiming, among other things, that PA 90 was unrelated to the original purpose of the Michigan Aeronautics Code. Id. at 833. The Michigan Court of Appeals held that the revisions were germane because the code provided uniform guidelines for the operation of airports and PA 90 similarly promoted a uniform management and operation of Michigan airports. Id. The usefulness of this case is dubious because it does not appear that there was any change in the legislation in its passage through the Legislature. The same is true of People v. Cynar, 651 N.W.2d 136 (Mich. Ct. App. 2002), where the court addressed a legislative addition to the Revised Judicature Act, although there was no change in the enactment in its passage through the Legislature.

expressed in the Constitution is superior [sic] to the will of the Legislature as expressed in its act, and the duty is upon the court to so hold."). What was said by the Michigan Supreme Court in <u>Anderson</u> is true here: "The constitutional right of the people to have the Legislature act in accordance with the constitution is the issue in this case." <u>Anderson</u>, 353 N.W. 2d at 449. The Court must conclude that the enactment of PA 45 violates Article IV, § 24 of the Michigan Constitution.

## V. CONCLUSION

For the reasons explained above, the Court declares that PA 45 was enacted in violation of Article IV, § 24 of the Michigan Constitution and is, therefore, invalid and unenforceable. The Court awards summary judgment to initiating Plaintiffs on Count II of their complaint and to Intervenor on Count III of its complaint; Defendants' motion seeking summary judgment as to those counts is denied. In so ruling, the Court need not, and does not, address the equal protection claims of Count I of initiating Plaintiffs' complaint and Counts I and II of Intervenor's complaint. Therefore, the Court denies Defendants' motion for summary judgment relative to those counts as moot.

Counsel shall appear for a status conference on February 19, 2014 at 10:30 a.m. at the U.S. Courthouse, 600 Church Street, Flint, Michigan to discuss further proceedings in this case.[11]

---

[11] One issue the Court will address is whether any additional remedy is required beyond the declaratory relief granted in this Opinion. Plaintiffs did make terse requests for injunctive relief in their motions, but they did not explain the need for such relief or otherwise elaborate on the traditional prerequisites for injunctive relief. <u>See</u> Pls.' Br. at 18 (Dkt. 34) (stating in conclusion that "Defendants should be enjoined from enforcing" the statute); Interv.'s Br. at 17 (Dkt. 32) (requesting Court to enjoin enforcement of PA 45). A court need not address an argument that is not adequately briefed or developed. <u>Rivet v. State Farm Mut. Auto. Ins. Co.</u>, 316 F. App'x 440, 449 (6th Cir. 2009) (refusing to address "arguments that . . . are unsupported or undeveloped."). While the Court does not grant injunctive relief in this Opinion, it does not foreclose that possibility if an adequate showing is made.

SO ORDERED.

Dated:  February 5, 2014                    s/Mark A. Goldsmith
           Flint, Michigan                         MARK A. GOLDSMITH
                                                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 5, 2014.

                                                           s/Deborah J. Goltz
                                                           DEBORAH J. GOLTZ
                                                           Case Manager

24